# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

LISA WILSON,               )
                                )
        Plaintiff,        )
                                )
vs.                      )        **Civil Action No. CV-13-S-1008-NE**
                                )
BIG LOTS STORES, INC.,   )
                                )
        Defendant.     )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Lisa Wilson, asserts claims against her employer, Big Lots Stores, Inc. ("Big Lots"), for sexual harassment, hostile work environment, and retaliation, pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000 *et seq.*[1] The case currently is before the court on defendant's motion for summary judgment.[2]  Upon consideration of the briefs and evidentiary submissions, the court concludes that the motion is due to be granted in part and denied in part.

## I. STANDARD OF REVIEW

---

[1] *See* doc. no. 17 (Amended Complaint).  The amended complaint also included claims against Big Lots by three other current and former employees: *i.e.,* Sondra Keaton; Rhonda Simpson; and Gina Fulton.  The court severed those claims on October 18, 2013, and ordered that new case files be opened for each of the individual plaintiffs.  Doc. no. 18.  The civil action number stated in the caption applies *only* to the claims of plaintiff Lisa Wilson.

[2] Doc. no. 25.

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-moving party are not unqualified, however.  "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration supplied). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II. SUMMARY OF FACTS[3]

### A.    Plaintiff's Employment History

Plaintiff, Lisa Wilson, began working for Big Lots in 1991. She transferred to the Florence, Alabama store, where she continues to work, in 1996.[4] She was promoted to Assistant Manger of the Florence store in 2006. As Assistant Manager, plaintiff was primarily responsible for merchandising, including overseeing the unloading of trucks, and the stocking and presentation of merchandise. Plaintiff reported directly to the Store Manager, Gary Pagan.[5]

---

[3] In her response brief, plaintiff did not respond, paragraph-by-paragraph, to any of the proposed findings of facts stated by defendant in its brief. *See* doc. no. 28 (response brief). Accordingly, all of defendant's proposed facts are deemed admitted for summary judgment purposes. *See* doc. no. 6 (Uniform Initial Order), at 15-16. Additionally, many of the proposed undisputed facts in plaintiff's brief discuss behavior Collingsworth directed at another employee, Rhonda Simpson. *See* doc. no. 28 (plaintiff's brief), at 5-10 (Proposed Facts 15-29). Ms. Simpson also filed a case in this court against Big Lots, but her claims were dismissed on July 8, 2014. *See Rhonda Simpson v. Big Lots Stores, Inc.,* Civil Action No. 5:13-cv-1924-IPJ, doc. no. 22. The alleged harassment suffered by Ms. Simpson is not relevant to the claims asserted by plaintiff in this case.

[4] Doc. no. 27-1 (Deposition of Lisa Wilson), at 16-17.

[5] *Id.* at 19-22.

3

## B. Defendant's Harassment-Free Environment Policy

The Big Lots Associate Handbook contains the company's Harassment-Free

Environment Policy. That policy states:

> We intend to maintain an environment in which all associates can perform their duties free of harassment and discrimination. If you believe you have been the subject of harassment, you should report the alleged act to your Manager or to your Regional Human Resources manager (RHRM) immediately so the problem can be corrected. Some states have different requirements for anti-harassment policies. This policy does not apply where state law requires otherwise.

> The Big Lots Harassment-Free Environment Policy complies with all local, state, and federal laws dealing with unlawful discrimination and/or harassment.

> Each manager is responsible for maintaining a work environment that is free of harassment, both sexual and otherwise. This includes communicating this Policy to all associates and making sure that no one is subjected to insulting, degrading, or exploitative behavior.

> Likewise, it's the responsibility of every associate to comply with this Policy and report any violations. Please be assured that you will not be penalized in any way for reporting inappropriate behavior. As per our Open Door Policy, honest two-way communication is essential to the successful operation of our business.

> All reports of inappropriate conduct or discrimination will be promptly investigated under the direction of the Human Resources Department. All investigations will be conducted with the utmost concern for the confidential and personal nature of the allegation and with a high degree of sensitivity to the individuals involved. If you are found to have engaged in discriminatory or harassing behavior, you will receive Disciplinary Counseling up to and including termination of employment. Retaliation against anyone reporting acts of harassment

will not be tolerated.[6]

The Policy also states that Big Lots has "zero tolerance" for any type of harassment, including sex-based harassment. The Policy defines harassment as including

> unwelcome verbal, visual, or physical conduct creating an intimidating, offensive, or hostile work environment that interferes with work performance. Harassment [also] can be verbal (including slurs, jokes, insults, epithets, gestures, or teasing), graphic (including offensive posters, symbols, cartoons, drawings, computer displays, or e-mails), or physical conduct (including physically threatening another, blocking someone's way, etc.) that denigrates or shows hostility or aversion toward an individual because of any protected characteristic. Such conduct violates this policy, even if it is not unlawful. Because it is difficult to define unlawful harassment, associates are expected to behave at all times in a professional and respectful manner.[7]

An employee who believes she has observed any violation of the Harassment-Free Environment Policy is instructed to inform her Manager or the Regional Human Resources Manager. If the employee is not satisfied with the response at that level, she is directed to contact Big Lots' "Vice President of Associate Relations

---

[6] Doc. no. 27-3 (January 2008 Associate Handbook), at ECF 8. **Note**: "ECF" is the acronym for "Electronic Case Filing," a system that allows parties to file and serve documents electronically. *See Atterbury v. Foulk*, No. C-07-6256 MHP, 2009 WL 4723547, at *6 n.6 (N.D. Cal. Dec. 8, 2009). Bluebook Rule 7.1.4 *permits* citations to the "page numbers generated by the ECF header." *Wilson v. Fullwood*, 772 F. Supp. 2d 246, 257 n.5 (D. D.C. 2011) (citing *The Bluebook: A Uniform System of Citation* R. B. 7.1.4, at 21 (Columbia Law Review Ass'n *et al.*, 19th ed. 2010)). Even so, *The Bluebook* recommends "against citation to ECF pagination in lieu of original pagination." *Wilson*, 772 F. Supp. 2d at 257 n.5. Thus, unless stated otherwise, this court will cite the original pagination in the parties' pleadings. When the court cites to pagination generated by the ECF header, however, it will, as here, precede the page number with the acronym "ECF."

[7] Doc. no. 27-3 (January 2008 Associate Handbook), at ECF 9 (alteration supplied).

immediately or call the **GET REAL HOTLINE at 1.866.834.REAL (7325).**"[8] Employee also are advised that they can make a report to an appropriate government agency, including the United States Equal Employment Opportunity Commission (EEOC).[9]

Plaintiff received a copy of the Associate Handbook when she was hired, and additional copies over time, as the policies were updated. She also had access to the Handbook online and, after becoming an Assistant Manager, she received computer-based training for managers every two years.[10] As part of that training, plaintiff viewed an anti-harassment video in May of 2012. It was not until then that she began to suspect that she had been subjected to unlawful sexual harassment.[11]

## C.    The Alleged Harassment

The entire time plaintiff worked in the Florence store, a man named W.C. Collingsworth also was an Assistant Manager in charge of Operations. His duties included hiring, paperwork, and maintenance of the Florence facilities.[12] After plaintiff became an Assistant Manager in 2006, she and Collingsworth were equals:

---

[8] *Id.* (emphasis in original).

[9] *Id.* at ECF 9-10.

[10] Wilson Deposition, at 45-46, 72-74.

[11] *Id.* at 24, 44, 45.

[12] *Id.* at 18-19, 113.

in other words, neither was in a supervisory position over the other.[13]

Plaintiff felt that Collingsworth was unproductive at work, and spent too much time talking on the telephone and to others.[14]  One topic he talked about at least once a week was his sex life and past sexual conquests.[15]  For example, Collingsworth alleged that he: had sex with a woman under an oak tree by the highway; had sex with a woman in a pineapple field in Hawaii; had sex in a car with a woman who bumped into the gear shift, causing the car to roll near the edge of a cliff; met a nymphomaniac in New Orleans who had an orgasm when he nibbled on her ear; previously owned a dress shop and traded dresses to customers for sexual favors; was caught by a manager at a different job having sex on the roof; was pushed into a closet by a woman at a Christmas party who wanted to have sex with him; visited a "whorehouse" in Vietnam where the prostitutes would offer him "suckie suckie" for two dollars; was in bed with a woman in Vietnam when the building was bombed; let an older girl "rub on him" at a bus stop when he was thirteen; and got a "hard-on" when a girl "rubbed on him" during a movie.  Collingsworth also said that he caught a customer in his dress shop masturbating to a mannequin, that he (Collingsworth) was uncircumcised, and that he knew he would be okay after having a stroke in 2002

---

[13] *Id.* at 79.

[14] *Id.* at 25, 53, 58.

[15] *Id.* at 54.

because he woke up with an erect penis.[16]  The words used by Collingsworth that plaintiff found offensive included "hard-on," "titties," "suckie suckie," "whorehouse," "erect," "penis," "orgasm," "get off," and "fuck."[17]  Sometimes, when Collingsworth told his boorish stories, he would prop up his leg and grab his crotch, although plaintiff acknowledged during her deposition that Collingsworth may have just been "adjusting himself."[18]  Collingsworth also once said, "You know how a good pair of Levi's feels when you're young."[19]

Collingsworth "told everybody the same stories" and jokes — including plaintiff, other male and female employees, customers, and the man who delivered bread to the store.[20]

Plaintiff testified that Collingsworth also told inappropriate jokes "all the time," but, during her deposition, she could only recall the basic outlines of two of the jokes.  The first was the so-called "Frito Lay" joke about a dead woman who had a tag on her toe and was called a "free-toed-lay."[21]  The second was about two people in a jail, one of whom had a larger anus (he said "asshole") than the other.  She could

---

[16] Wilson Deposition, at 31-35, 137-38, 150-55.

[17] *Id.* at 15.

[18] *Id.* at 31-32.

[19] *Id.* at 30.

[20] *Id.* at 26, 65, 82, 89.

[21] *Id.* at 99.

not recall exactly when she heard those jokes, only that it was sometime within the last five to ten years.[22]

Collingsworth engaged in other inappropriate behavior. He sometimes commented on customers' breast sizes. When plaintiff responded that she did not look at the breasts of other women, Collingsworth elaborated by comparing the customer's breast size to plaintiff's.[23] There is no indication in the record how often such comments were made. Additionally, on an unspecified date, after returning from a trip to New Orleans for Mardi Gras, Collingsworth brought to work pictures of a naked midget and a woman exposing her breasts.[24]

The entire time plaintiff knew Collingsworth, he called her names like "Dream," "Love Boat," "Dear Heart," and "Love."[25] He also told plaintiff that he wanted to put her in his suitcase and take her with him on vacation. Those comments continued through 2012.[26] Anytime Collingsworth was out of work for an extended period of time, he would hug plaintiff and kiss her on the cheek when he returned.[27] Plaintiff did not know how many times Collingsworth had hugged or kissed her over

---

[22] Wilson Deposition, at 99-100.
[23] *Id.* at 36.
[24] *Id.* at 25.
[25] *Id.* at 30, 101.
[26] *Id.* at 101.
[27] *Id.* at 24, 35-36.

the years, or the date on which that last occurred.[28]  Collingsworth grabbed plaintiff's arm "all the time," or "almost every day," and pulled her close to him, in order to whisper in her ear, or move her closer when she was talking.  He said that he did so because he was hard of hearing.  Plaintiff testified that the touching of her arm and whispering in her ear occurred as recently as 2012.[29]

Collingsworth never threatened plaintiff, propositioned her for sex, touched her breasts or other private parts, exposed himself to her, or called her any derogatory names, like "whore" or "bitch."[30]  Plaintiff testified that she tried to avoid being around Collingsworth as much as possible, but she did not identify any specific way in which Collingsworth's behavior negatively affected her job performance.  In fact, plaintiff consistently received positive performance reviews from her supervisors.[31]

D.     The 2006 Investigation

In 2006, Bruno Lijoi, who then was District Manager for Big Lots, conducted an investigation into a complaint about Collingsworth's offensive behavior that had been lodged by another employee, Lisa King, who then was the store's Furniture Manager.[32]  Plaintiff was asked to provide a statement on April 12, 2006.  While

---

[28] Wilson Deposition, at 24, 35-36.

[29] Id. at 24, 35-36, 101.

[30] Id. at 23-24, 34, 90-91.

[31] Id. at 23, 25, 90-91.

[32] Doc. no. 27-3 (Declaration of Rick Saenz) ¶ 6.

plaintiff was contemplating what to say, Gary Pagan, the Store Manager, told her, "Just remember that you're part of the management team now, and we need to stand beside each other."[33]  Plaintiff wrote:  "I[,] Lisa Wilson[,] have nothing to comment about W.C. Collingsworth."[34]  She "wanted to say more," but she had just been made an Assistant Manager of the Florence store, and she "didn't want to jeopardize . . . didn't want to get into . . . didn't want to get involved really with everything, trying to be assistant manager at the time."[35]  As a result of the investigation, Collingsworth was issued a written Disciplinary Counseling on April 26, 2006, for violating Big Lots' standards of conduct.[36]  The Counseling document stated that Collingsworth had, indeed, made some inappropriate comments to female associates.  Collingsworth was cautioned to behave in a professional manner at all times, and that any further policy violations would "result in further disciplinary action up to and including termination."[37]

## E.    Other, Unspecified Complaints

At some unspecified time after 2006, plaintiff personally confronted

---

[33] Wilson Deposition, at 28.

[34] *Id.* at Exhibit 4.

[35] *Id.* at 28.

[36] Doc. no. 27-3 (Declaration of Rick Saenz) ¶ 6 and Exhibit 6 (April 26, 2006 Disciplinary Counseling).

[37] *Id.*

Collingsworth about his behavior. She was tired of other employees complaining to her about things Collingsworth had done or said to them, so she "sat him down" in the office and told him, "Look, I'm sick of it. I'm sick of hearing all this. I'm sick of hearing you telling dirty stories, and I'm sick of you talking this way."[38] After that conversation, Collingsworth's offensive behavior "stopped for maybe a week or two, and then it was just right back."[39]

Plaintiff also complained "numerous" times about Collingsworth's behavior to Gary Pagan, the Store Manager, but she could not be more specific about the number and timing of her complaints.[40] Pagan typically responded to her complaints by asking, "When is he going to retire? Why does he do this? Does he know how much trouble he's going to get in?" Then Pagan would tell plaintiff he would "take care of it," so plaintiff believed that Pagan was addressing the issue with Pagan "all those years."[41] Each time plaintiff complained to Pagan, Collingsworth's behavior would stop for "a week or so here and there," but "then he would just go right back."[42]

Big Lots also set up a 1-800 number that employees could use to lodge

---

[38] Wilson Deposition, at 37.

[39] *Id.*

[40] *Id.* at 41.

[41] *Id.*

[42] *Id.* at 42.

anonymous complaints harassment or other issues in the workplace. Plaintiff never placed a call to that number, but when another employee did at some unspecified time during plaintiff's employment, Store Manager Gary Pagan became upset and instructed the employees never to call the number again.[43]

## F.    2012 Complaints and Defendant's Responses

At some unspecified point during 2012, a new employee named Amanda Nichols told plaintiff that Collingsworth had "touched her breast and moved it up and down."[44]  Nichols did not want plaintiff to report the incident, but plaintiff told her she was required to inform Anthony Thomas, the District Manager.  Thomas directed plaintiff to obtain a written statement from Nichols, but Nichols refused to provide one.[45]  Plaintiff also told Gary Pagan about the incident.  Pagan told plaintiff to make sure she informed Thomas, and directed her to "do what you need to do."[46] Nichols quit her job the next day, however, and plaintiff did not hear anything else from her. Without a written statement from Nichols, the investigation did not proceed.[47]

Gina Fulton, another female employee who now is deceased,[48] complained to

---

[43] *Id.* at 38-39.

[44] Wilson Deposition, at 54.

[45] *Id.* at 54-55.

[46] *Id.* at 56.

[47] *Id.* at 54-55.

[48] Gina Fulton also filed a case in this district, *Fulton v. Big Lots Stores, Inc.,* Civil Action No. 5:13-cv-1926-CLS.  Her complaint was dismissed without prejudice, at the request of her estate,

Pagan that Collingsworth brushed up against her with an erect penis while they were in the office counting down their registers on April 14, 2012.[49]  Pagan issued Collingsworth a written Disciplinary Counseling on April 20, 2012, for violation of the Big Lots Standards of Conduct.  Specifically, the Counseling document cautioned Collingsworth that "[n]o inappropriate comments are to be made to offend associates about his or their personal life."[50]

Approximately two weeks later, Fulton told plaintiff that, after making her complaint to Pagan, she overheard Pagan discussing the complaint with Collingsworth.  Pagan said:  "What if Anthony [Thomas] had found out?"[51]  That comment caused plaintiff to believe that Pagan had not been reporting any of the incidents involving Collingsworth to Thomas, so she decided to relay Fulton's complaint directly to Thomas herself.[52]  Plaintiff called Thomas on May 4, and also forwarded him the following written statement from Fulton:

> Friday April 13th at approx 4:00 pm, I was in the office with W.C. Collingsworth counting my till at the table when he came up behind me & started to rub my shoulders.  At this point, I <u>hurried</u> to finish & leave.  As I went to stand up, he brushed his — what felt to be an erect penis against my low back 2 times.  I hurried & left for the day.  Later I

on October 29, 2013.  Doc. no. 6 in Civil Action No. 5:13-cv-1926-CLS.

[49] Wilson Deposition, at 46-47, 75.

[50] Saenz Declaration, Exhibit 7 (Disciplinary Counseling) (alteration supplied).

[51] Wilson Deposition, at 46-47, 75 (alteration supplied).

[52] *Id.*

reported it to Gary Pagan & he said he would talk to him, & had just dealt with him 2 weeks prior about another situation similar in nature.[53]

The Big Lots Ethics and Compliance Hotline also received an anonymous report on May 4, 2012, alleging that "an Assistant Manager has been sexually harassing the female employees and customers."[54] The summary of the call stated:

The anonymous caller, an employee from Store 33 (1700 Darby Dr., Florence, AL), reported that W.C. Collinsworth (spelling provided), Assistant Manager, has sexually harassed the female employees (names withheld by the caller). The caller explained that the situation has been ongoing for the past 15 to 16 years. Collinswoth has made filthy jokes and told at least "90 percent" of the female employees that his penis was uncircumcised.

According to the caller, Collinsworth gropes the female employees' breasts and brushes up against the female employees with an erect penis. The caller added that Collinsworth also has attempted to hug and kiss the female employees in an attempt to feel their breasts. Collinsworth has also done this with several female customers (names unknown to the caller).

The situation has been reported to Gary Pagan (spelling provided), Store Manager, on several occasions. Pagan does not help the female employees, he tells them not to "rock the boat" and that the "situation could get Big Lots into a lot of trouble."

The caller stressed that s/he has quit as of May 4, 2012, because s/he could no longer tolerate Collinsworth's behavior. The caller disclosed that if s/he goes back into Store 333 to shop and Collinsworth attempts to touch his/her breasts s/he will spray him with mace.[55]

---

[53] Wilson Deposition, at 75, 131 and Exhibit 5 (emphasis in original).

[54] Doc. no. 27-6 (Declaration of Anthony Thomas), Exhibit 3, at 1.

[55] *Id.*

The report indicated that Collinsworth's behavior was "ongoing" and had occurred "daily" for fifteen to sixteen years.[56]

District Manager Anthony Thomas began investigating both Fulton's complaint and the anonymous complaint on May 7 and 8, 2012. He interviewed Fulton, potential witnesses Fulton had identified, and several female employees. He also interviewed Collingsworth, who denied all of the allegations against him.[57] Thomas interviewed plaintiff on May 8. During her deposition, plaintiff could not specifically recall what she told Thomas.[58] Thomas testified, however, that plaintiff reported to him that Collingsworth had told sexual jokes in the workplace, commented on the size of customers' breasts, and told inappropriate stories about his past sexual encounters. Plaintiff told Thomas that Collingsworth had never touched her inappropriately or directed inappropriate comments toward her specifically. Thomas asked plaintiff to provide specific examples of situations where Collingsworth had said inappropriate things, but she did not provide any examples. She also did not identify any witnesses to Collingsworth's behavior.[59]

At the completion of Thomas's investigation, he and Regional Human

---

[56] *Id.* at 2.

[57] Thomas Declaration ¶ 3.

[58] Wilson Deposition, at 51-52.

[59] Thomas Declaration ¶ 4.

Resources Manager Rick Saenz concluded that Collingsworth had made inappropriate jokes, told inappropriate stories about his personal life, and occasionally hugged or patted other employees on the arm. Even so, they could not verify that Collingsworth had brushed up against Fulton with his penis. Moreover, no other witnesses stated that Collingsworth had ever groped them, brushed his penis against their body, or touched them in any other way than occasional hugs or pats on the arm.[60] Collingsworth was issued a Final Disciplinary Counseling on July 17, 2012, for violations of Big Lots' Standards of Conduct. The Counseling document stated:

> On various occasions WC has hugged associates, talked about his personal life, and made inappropriate jokes. Many associates have complained and are not comfortable with conversations about his day to day life. Although some associates believe he is not threatening, and does not mean to upset anyone, his comments and stories are inappropriate in the workplace. WC must understand our policy on a Harassment free environment. He cannot joke about his ex-girlfriends or touch associates in any way. This includes hugging or just putting his arm around someone's shoulders. This issue has been addressed with WC in the past.[61]

Collingsworth was cautioned that "[f]urther inappropriate conduct such as what is mentioned above may include disciplinary counseling up to and including termination."[62]

---

[60] *Id.* ¶ 5.

[61] *Id.* at Exhibit 5 (Big Lots Disciplinary Counseling form).

[62] *Id.* (alteration supplied).

A few weeks after Thomas had completed his investigation, he called plaintiff and told her that she should inform him if there were any further problems with Collingsworth. Plaintiff did not report any further incidents to Thomas, and she testified that, after Thomas had completed his investigation, Collingsworth did not tell her any more sexual stories or jokes, or direct any more unprofessional behavior toward her.[63]

Even so, plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission on August 29, 2012, alleging retaliation and discrimination based on her sex.[64] She complained that Collingsworth had sexually harassed her, and stated that she had reported the harassment to her superiors. She alleged that, throughout her employment at Big Lots, she was "subjected to sexually provocative stories, sexual jokes, lewd gestures and unwanted physical contact from W.C. I am continuously sexually harassed and made to work in a hostile work environment. To my knowledge, W.C. has not been disciplined and his actions continue."[65] She also stated that "[t]he harassment by W.C. and management's unwillingness to investigate my complaints, has forced me to endure harassment and retaliation,"[66] but she did not

---

[63] Wilson Deposition, at 64-67.

[64] Wilson Deposition, at Exhibit 8 (EEOC Charge).

[65] *Id.*

[66] *Id.* (alteration supplied).

18

elaborate on what kind of retaliation she had allegedly suffered. Plaintiff also referenced an "<u>attached statement</u> which sets out recent, specific instances where I have complained of sexual harassment to upper management and specific instances of sexual harassment I was made to endure,"[67] but the court could not locate a copy of that statement anywhere in the record.

Rick Saenz, the Regional Human Resources Manager, traveled to the Florence store on an unspecified date to investigate the allegations in plaintiff's EEOC charge.[68] Plaintiff could not recall the details of her conversation with Saenz because she was "caught off guard" when she learned that Saenz was at her store.[69] Saenz testified, however, that plaintiff told him that Collingsworth "had never said or done anything to her because he knows that if he did then I would knock him out and he would be taken to court."[70] At some point, plaintiff refused to talk to Saenz any longer, telling him that he would need to speak to her attorney instead.[71] Saenz also met with Collingsworth, who once again denied any wrongdoing.

At some point during Saenz's investigation, Collingsworth stated that he wanted to resign his employment. He submitted a letter on September 14, 2012,

---

[67] *Id.* (emphasis in original).

[68] Saenz Declaration ¶ 9; Wilson Deposition, at 105.

[69] Wilson Deposition, at 105.

[70] Saenz Declaration ¶ 10.

[71] Wilson Deposition, at 106-08.

stating, "I, W.C. Collingsworth, have decided to retire at this time effective September 26, 2012. This decision is made freely and from my own schedule for the future. I stand firmly by any and all statements I have made pertaining to recent events."[72]

## G.     Facts Related to Plaintiff's Retaliation Claim

When Collingsworth resigned, plaintiff took over his position as Assistant Manager over Operations, and an employee named Josh Flanagan took over plaintiff's previous position as Assistant Manager over Merchandising.[73]  As Assistant Manager over Operations, plaintiff was responsible for ensuring that the restrooms stayed clean, although she could delegate the actual cleaning tasks to other employees.  Plaintiff did not ask for or expect the reassignment to Assistant Manager over Operations.[74]

Gary Pagan retired as Store Manager approximately one week before plaintiff's March 11, 2014 deposition.[75]  When plaintiff learned about Pagan's retirement, she called District Manager Anthony Thomas to tell him that she was interested in applying for the position.  Thomas informed her that he had already awarded the

---

[72] Saenz Declaration, at Exhibit 12.

[73] Wilson Deposition, at 21.

[74] *Id.* at 113.

[75] *Id.* at 63.

position to Joey Bell, who previously had served as Manager of the Tupelo, Mississippi Big Lots store. Bell had approximately twenty years of experience in retail management, and Thomas considered him the best candidate for the position.[76]

## III. DISCUSSION

### A.    Sexual Harassment/Hostile Work Environment

Plaintiff's Amended Complaint asserted separate claims for "sexual harassment" and "hostile work environment" under Title VII.[77] Because plaintiff has not alleged that she suffered a tangible adverse employment action as a result of Collingsworth's harassment, there is no actual distinction between the two claims. *See Pipkins v. City of Temple Terrace, Fla.*, 267 F.3d 1197, 1200 n.3 (11th Cir. 2001) ("Generally, sexual harassment claims are argued as either hostile work environment claims or *quid pro quo* claims. The difference between the two is that the former do not result in tangible employment actions, while the latter do.") (citing *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 760-63 (1998)).

### 1.    Timeliness of plaintiff's claim

A plaintiff must satisfy a number of administrative prerequisites before filing a suit based upon Title VII. Foremost among these is the requirement that a charge

---

[76] *Id.*; *see also* Thomas Declaration ¶ 7.

[77] *See* doc. no. 17 (Amended Complaint), at Counts One and Two.

of discrimination be submitted to the Equal Employment Opportunity Commission within 180 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). In hostile work environment cases, however, the claim can be timely even if the first instance of harassment "occurred" more than 180 days before the charge was filed. The Supreme Court has recognized that a hostile work environment claim based upon racial or sexual harassment "is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (quoting 42 U.S.C. § 2000e-5(e)(1)). For that reason, "[a] charge alleging a hostile work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the [180 day] time period." *Id*. at 122 (alterations supplied).

> Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. See 1 B. Lindemann & P. Grossman, Employment Discrimination Law 348-349 (3d ed.1996) (hereinafter Lindemann) ("The repeated nature of the harassment or its intensity constitutes evidence that management knew or should have known of its existence"). The "unlawful employment practice" therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. See *Harris v. Forklift Systems, Inc*., 510 U.S. 17, 21 (1993) ("As we pointed out in *Meritor* [*Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986),] 'mere utterance of an . . . epithet which engenders offensive feelings in a[n] employee,' *ibid*. (internal quotation marks omitted), does not sufficiently

affect the conditions of employment to implicate Title VII"). Such claims are based on the cumulative effect of individual acts.

    . . . .

    In determining whether an actionable hostile work environment claim exists, we look to "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." [*Harris*, 510 U.S.] at 23, 114 S. Ct. 367. To assess whether a court may, for the purposes of determining liability, review all such conduct, including those acts that occur outside the filing period, we again look to the statute. It provides that a charge must be filed within 180 or 300 days "after the alleged unlawful employment practice occurred." A hostile work environment claim is composed of a series of separate acts that collectively constitute one "unlawful employment practice." 42 U.S.C. § 2000e-5(e)(1). The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

    . . . .

    It is precisely because the entire hostile work environment encompasses a single unlawful employment practice that we do not hold . . . that the plaintiff may not base a suit on individual acts that occurred outside the statute of limitations unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on such conduct. The statute does not separate individual acts that are part of the hostile environment claim from the whole for the purposes of timely filing and liability. And the statute does not contain a requirement that the employee file a charge prior to 180 or 300 days "after" the single

unlawful practice "occurred." Given, therefore, that the incidents constituting a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim. In order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment.

*Morgan*, 536 U.S. at 115-18 (footnotes omitted) (all alterations in first paragraph in original, other alterations and ellipses supplied). *See also Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1258 (11th Cir. 2003) (recognizing that, in *Morgan*, "the Supreme Court simplified the limitations inquiry in hostile work environment cases. The Court instructed that a hostile work environment, although comprised of a series of separate acts, constitutes one 'unlawful employment practice,' and so long as one act contributing to the claim occurs within the filing period, 'the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.'") (quoting *Morgan*, 536 U.S. at 117).

Defendant asserts that the allegedly sexually harassing acts identified by plaintiff *outside* the 180-day filing period are not sufficiently related to the allegedly harassing acts that occurred *within* the 180-day fling period for any of the earlier acts to be considered part of plaintiff's claim.[78] This court disagrees. All of the allegedly

[78] Plaintiff did not directly respond to this argument in her brief, but she did repeatedly assert arguments based on facts that occurred outside the 180-day period. Therefore, in a generous effort to construe plaintiff's briefs in the light most favorable to her, the court will assume that plaintiff has opposed defendant's timeliness argument.

harassing acts about which plaintiff complains are part of the same pattern of offensive behavior by Collingsworth. Stated differently, all of the allegedly harassing acts collectively form part of the cause of action. Accordingly, all of the behavior about which plaintiff complains — even that which occurred more than 180 days before plaintiff filed her EEOC charge on August 29, 2012 — can be considered part of her hostile work environment claim.

### 2. Merits of the claim

To succeed on her hostile work environment claim, plaintiff must show that: (1) she belongs to a group protected by Title VII; (2) she was subjected to unwelcome harassment; (3) the harassment was based upon her sex; (4) the harassment was sufficiently severe or pervasive as to alter the terms and conditions of her employment; and (5) there is a basis for holding defendants responsible under a theory of either vicarious or direct liability. *See, e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998); *Ellerth*, 524 U.S. at 751; *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 508 (11th Cir. 2000). The first two elements cannot be disputed. As a female, plaintiff belongs to a protected group. *See Henson v. City of Dundee,* 682 F.2d 897, 903 (11th Cir. 1982) ("As in other cases of sexual discrimination this [element] requires a simple stipulation that the employee is a man or a woman.") (alteration supplied). Plaintiff also has testified that she was

subjected to boorish comments and offensive behavior that she found unwelcome. Construing the evidence in the light most favorable to plaintiff, it is clear that she has created genuine issues of material fact regarding the final elements. A reasonable jury could find that the harassment she complains of was based upon her sex, and that it was sufficiently severe or pervasive to satisfy the *prima facie* case. Finally, a reasonable jury could conclude that Big Lots had constructive notice of Collingsworth's harassing behavior, but failed to take prompt and appropriate remedial action, thereby providing a basis for holding Big Lots liable for Collingsworth's behavior.[79] Accordingly, summary judgment is due to be denied on plaintiff's sexual harassment and hostile work environment claims.

## B. Retaliation

---

[79] Because Collingsworth was plaintiff's co-worker, not her supervisor, Big Lots can be held liable for Collingsworth's actions if it either knew, or should have known, of the alleged harassment, but failed to take prompt and appropriate remedial action. *See, e.g.*, *Faragher*, 524 U.S. at 799 (collecting cases); *Ellerth*, 524 U.S. at 759 ("Negligence sets a minimum standard for employer liability under Title VII."); *Watson*, 324 F.3d at 1259 ("When . . . the alleged harassment is committed by co-workers or customers, a Title VII plaintiff must show that the employer either knew (actual notice) or should have known (constructive notice) of the harassment and failed to take immediate and appropriate corrective action."). "Constructive notice . . . is established when the harassment was so severe and pervasive that management reasonably should have known of it." *Watson*, 324 F.3d at 1259 (citing *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1278 (11th Cir. 2002)). "[A]n employer need not act instantaneously, but must act in a reasonably prompt manner to respond to the employee's complaint." *Frederick v. Sprint/United Management Co.*, 246 F.3d 1305, 1314 (11th Cir. 2001) (citing *Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1302 (11th Cir. 2000)) (alteration supplied). Similarly, an employer's remedial measure is adequate if it is "reasonably likely to prevent the misconduct from recurring." *Baldwin v. Blue Cross/Blue Shield of Alabama,* 480 F.3d 1287, 1305 (11th Cir. 2007) (internal quotation marks and citations omitted).

"Retaliation is a separate violation of Title VII." *Gupta v. Florida Board of Regents,* 212 F.3d 571, 586 (11th Cir. 2000). A plaintiff generally must prove three elements to establish a *prima facie* case of retaliation: (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) there was a causal linkage between the protected conduct and the adverse employment action. *See, e.g., Shannon v. BellSouth Telecommunications, Inc.*, 292 F.3d 712, 715 (11th Cir. 2002).

> Once plaintiff establishes a prima facie case [of retaliation] by proving only that the protected activity and the negative employment action are not completely unrelated, the burden shifts to the defendant to proffer a legitimate reason for the adverse action . . . . The burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the "legitimate" reason is merely pretext for prohibited, retaliatory conduct.

*Sierminski v. Transouth Financial Corporation*, 216 F.3d 945, 950 (11th Cir. 2000) (citations omitted) (alteration supplied).

Plaintiff argues that her failure to receive the Store Manager position after Gary Pagan retired in March of 2014 was an act of unlawful retaliation. Her entire argument on that claim consists of the following:

> Once the Plaintiff learned that [Pagan] was retiring, she advised Thomas that she was interested in [Pagan's] position. Thomas immediately told her that the position had been given to someone else. . . . Plaintiff was not afforded the right to apply for the position inasmuch as the position was improperly awarded to another individual even though the Plaintiff was more qualified and experienced having worked in that store location

alongside Collingsworth for years.[80]

Although the denial of a promotion would be considered an adverse employment action, plaintiff failed to identify the protected activity that precipitated the retaliatory denial. Perhaps it was her EEOC charge, which was filed on August 29, 2012. Perhaps it was the filing of this lawsuit on May 28, 2013.[81] Regardless of which event plaintiff alleges as the trigger for the claimed retaliation, she cannot establish a causal connection between that event and her failure to receive the Store Manager position. As an initial matter, she did not even express interest in the position until *after* it had been filled. Further, the Store Manager position was awarded to Joey Bell in early March of 2014. That was more than eight months *after* plaintiff's most recent protected activity. When a plaintiff attempts to satisfy the causal connection element through the use of temporal proximity evidence alone, the temporal gap between the protected activity and the adverse action must be very close. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) ("But

---

[80] Dc. no. 28 (plaintiff's brief), at 27-28 (alterations supplied). Plaintiff actually states in her brief that it was *Collingsworth's* position for which she stated an interest. *See id.* at 27 ("Once the Plaintiff learned that *Collingsworth* was retiring, she advised Thomas that she was interested in *Collingsworth*'s position.") (emphasis supplied). In an effort to construe all of plaintiff's pleadings in a light most favorable to her, the court concludes this must have been a typographical error — albeit a quite serious one — by plaintiff's attorney. The record clearly reflects that plaintiff *did* receive Collingsworth's position as Assistant Manager over Operations after his retirement. Wilson Deposition, at 21, 113. Moreover, plaintiff testified during her deposition that it was *Pagan's* job as Store Manager about which she inquired to Thomas during the Spring of 2014. *Id.* at 63.

[81] *See* doc. no. 1 (Complaint).

28

mere temporal proximity, without more, must be 'very close.'") (quoting *Clark County School District v. Breeden*, 532 U.S. 268, 273 (2001)). "A three to four month disparity between the statutorily protected expression and the adverse employment action is not [close] enough." *Id.* (citing *Breeden*, 532 U.S. at 273) (alteration supplied). Finally, there is no other evidence suggesting a causal connection between any protected activity and the alleged retaliatory denial of a promotion. Accordingly, plaintiff cannot establish a *prima facie* case of retaliation.

Even if plaintiff had established a *prima facie* case, defendant has articulated a legitimate, non-retaliatory reason for awarding the Store Manager position to Joey Bell — *i.e.,* that Bell was the best candidate because he previously had served as the Store Manager at a different Big Lots store, and he had approximately twenty years of experience in retail management. Thus, plaintiff can survive summary judgment on her retaliation claim only if she comes "forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *Burdine*, 450 U.S. at 256; *McDonnell Douglas,* 411 U.S. at 804). Plaintiff's burden at this step of the analysis is that of "cast[ing] sufficient doubt on the defendants' proffered nondiscriminatory reasons to

permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct . . . .'" *Combs*, 106 F.3d at 1538 (quoting *Cooper-Houston v. Southern Railway Co.*, 37 F.3d 603, 605 (11th Cir. 1994)) (alteration supplied); *see also Chapman*, 229 F.3d at 1024-25. Plaintiff shoulders that burden by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1538 (quoting *Sheridan v. E.I. DuPont de Nemours & Company*, 100 F.3d 1061, 1072 (3d Cir. 1996)) (internal quotation marks omitted). Additionally, a plaintiff must produce "sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of *each* of the employer's proffered reasons for its challenged action." *Combs,* 106 F.3d at 1529 (emphasis supplied).

Plaintiff has offered no reason why defendant's proffered legitimate reason should be discredited. She states that she was "more qualified and experienced," but the record does not support that assertion. Even though plaintiff had worked at the Florence store for many years, and Bell had not, she had only served as an Assistant Manager, not a Store Manager. Bell, on the other hand, had served as the Store Manager at a different Big Lots store. It was reasonable for Big Lots to value Bell's previous experience as a Store Manager over plaintiff's familiarity with the Florence

store. Plaintiff also has not offered any evidence to indicate pretext based on the fact that she was not permitted to apply for the Store Manager position. There is no evidence in the record concerning how the position was advertised and how Pagan's replacement was selected. Absent any such information, the court is not persuaded that the selection process was pretextual.

## IV. CONCLUSION AND ORDER

In accordance with the foregoing, it is ORDERED that defendant's motion for summary judgment is GRANTED in part and DENIED in part. Plaintiff's claim for retaliation (Count Three of her Amended Complaint) is DISMISSED with prejudice. Her claim for sexual harassment/hostile work environment (encompassed within both Counts One and Two) will remain pending. A pretrial conference and trial on the remaining claim will be set by separate order.

**DONE** and **ORDERED** this 19th day of December, 2014.

_____
United States District Judge